291 P.2d 900

**YOUNG ELECTRIC SIGN CO. and Young Electric Sign Co., Inc., Plaintiffs,**

**v.**

**UTAH STATE TAX COMMISSION,**

Defendant.

No. 8383.

Supreme Court of Utah.

Dec. 28, 1955.

. Earl D. Tanner, Salt Lake City, for plaintiffs.

E. R. Callister, Jr., Atty. Gen., for defendant.

WADE, Justice.

This case is here on a writ to review a deficiency assessment for sales taxes for the period from July 1, 1950, to June 30, 1953, by the defendant State Tax Commission against the two plaintiffs corporations, Young Electric Sign Co. and Young Electric Sign Co., Inc. Both corporations do the same kind of business and the books and records of both are kept at the office of the Young Electric Co. in Salt Lake City, Utah, and the same method of accounting is used for both. The questions involved pertain to both companies so no distinction as to either will be made in this opinion hereafter.

The business of the plaintiffs consisted of the manufacture and sale of electric signs and parts thereof, the manufacture and rental of electric signs and the maintenance and repair of electric signs, both those manufactured and sold or rented by the plaintiffs or by others. There is no dispute between plaintiffs and defendant as to the taxes chargeable on the direct sales of signs and sign parts or on maintenance agreements by plaintiffs and owners of signs either manufactured by them or others. The disagreement centers on plain-

tiffs' rental agreements and options and rewrites thereof and on repair sales.

The commission ordered that on maintenance agreements the measure of the tax on parts and materials used in fulfilling these agreements should be 2% of the cost to the plaintiffs, on repair sales it should be the "2% of the fair selling price of the parts and materials used if separately stated on the bill to the customer, and, if not separately stated, 2% of the total billing" and on the rental agreements it should be 2% of the total rents received and that rental agreements included all options and rewrites.

It is plaintiffs' contention that the tax commission erred in assessing the "repair sales" at 2% of the billing to the customer. The commission ruled, however, that if plaintiffs separated the cost of materials from the charges for repairs in its billings to the customers, then, the tax would be on 2% of the fair selling price of the parts and materials. It was stipulated that the cost of the materials used was a minor part of the total billing for repair sales and that plaintiffs do not bill customers separately for labor and materials. However, cost records are kept by plaintiffs and it was agreed that the fair sales price of these materials is cost plus a 100% markup. It was further stipulated and agreed that "the proper measure of the tax to be charged for the materials used in maintaining and repairing signs under maintenance agreements should be the same as is charged for those materials used under 'repair sales.'"

Repair sales are those repairs made by plaintiffs on signs not belonging to them and not covered by one of their maintenance agreements, where the customer calls in for such service and plaintiffs' personnel and equipment go out and repair the sign, using what materials may be necessary. Such a customer is billed a lump sum, even though costs are kept separately in plaintiffs' books. The total billed for repair sales by one of the plaintiffs amounted to approximately $245,000, and the cost of materials used came to about $14,700, which is about 6% of the total amount charged. In Western Leather & Finding Co. v. State Tax Comm., 87 Utah 227, 48 P.2d 526, 529; this court held that whether a sales tax was payable by a "wholesaler" depended upon whether the sale was made to the ultimate consumer or to a "retailer" for resale to a consumer. Mr. Justice Wolfe in a special concurring opinion pointed out that in borderline cases it was difficult to determine whether a sale as contemplated by our Sales Tax Act when made by a wholesaler to someone who used it in connection with repairs was one which was made to a retailer for resale to a consumer or was a sale to the ultimate consumer. As it is clear our Act contemplated that wholesale sales were sales of "articles which were sold through wholesalers to persons for resale to those who actually used them, and contemplated a retailer as someone who sold goods from stock as such and not the person who furnishes material in connection with repairs." Justice Wolfe also pointed

out that in determining whether or not goods used in connection with repairs were resales to an ultimate consumer depended upon whether the goods used were mere incidentals as compared to the service performed. If they were mere incidentals and the value of the articles used was so small as compared to the value of the services, such contribution of the articles to the services could not be considered a sale under the maxim that the law does not notice trifling matters.

■ In the instant case the cost to the sign company of the materials used was about 6% of the total charge for the repairs. The Commission found that the materials used were a substantial part of the price paid for the services "and therefore more than incidental to the services rendered when compared to the total price charged by the company to the owner of the sign for the repair" and that the "fair sales price of those materials is cost plus 100% markup;" which means that the materials used in the repairs cost the company about 6% of the amount charged the customer, but the Commission found that the fair market value of the materials was about 12% of the cost of the charge to the customer. Whether this is stated one way or the other, the substance is the same, and our problem is to determine whether these were sales of materials under the Act, or whether the furnishing of materials was merely incidental to the furnishing of services for which the charge to the customers was actually made.

What the customers were obtaining from the companies were principally services and not goods. The customers did not obtain the right of possession or use of the sign as a result of such repair; they were the owners of the signs before the repairs were made. In our opinion, it would be unreasonable to find under these conditions that the materials represented a substantial portion of the outlay, and that their use was more than merely incidental to the services rendered. The Commission erred in assessing taxes on "repair sales."

■ Plaintiffs also contend that the Commission erred in holding that the total receipts from rental agreements were subject to the sales tax because over 50% of those receipts were charged for repairs and maintenance which are not taxable as sales. We cannot agree with this. Although it was stipulated that rental agreements "are contracts under which the company agrees to construct a given sign for the customer, install it on his premises, and maintain and repair it for the period of the agreement, and the customer agrees to pay therefore a fixed monthly charge * * *" which charge is determined by figuring what the cash sales price of the sign would be plus what would be charged for repairs and maintenance for the period of the contract. Sec. 59-15-2, subsec. (g), U.C.A.1953, specifically provides that:

"When right to continuous possession or use of any article of tangible personal property is granted under a

lease or contract and such transfer of possession would be taxable if an outright sale were made, such lease or contract shall be considered the sale of such article and the *tax shall be computed and paid by the vendor or lessor upon the rentals paid.*" (Emphasis ours.)

This statute is not ambiguous. It is not controverted that the transfer of possession of the signs under the rental contracts here involved are such that if outright sales were made they would be taxable under this section. In such event the plain wording of the statute requires the taxes to be computed upon the rentals paid. What elements enter into the charges for these rentals can be of no materiality.

■ We are constrained to hold the same as to the options and re-writes of these rental agreements even though the following stipulations of fact were made by the parties hereto.

"12. If the customer, at the end of the original rental period, desires to continue to use the sign, a maintenance agreement is executed for a new term, on the basis of 50% of the original monthly charge. The agreements are on the same form as the original rentals and are termed 're-writes' on the books of the company.

"13. Option income is that income received from signs held over after the expiration of the original rental agreement before the re-write is executed.

The charge for the option period is, like the re-writes, 50% of the monthly charge set by the original agreement.

"17. During the re-write period, because of the increased age of the sign, the cost of maintaining the same is greater than the maintenance expense during the original rental period. The rental during that re-write period is for the purpose of compensating the company for maintaining and repairing the sign, which includes the parts and materials, together with a reasonable profit.

"18. The entire cost of any signs placed with the customer under a rental agreement is amortized over the period of the original term of that agreement so that at the expiration of the lease period the sign is completely written off as an asset of the company. At that time the company eliminates from the contract price for the rental of the sign that portion of the rental which is attributed to recovering the cash sale price and re-writes the contract at a price approximately equal to what would be charged for the service and maintenance of the sign, were it the property of the customer."

Plaintiffs argue that from these stipulations it appears that although they used a rental agreement form in their re-writes, they in fact were not renting personal property in such re-writes the "possession of which would be taxable *if an outright sale*

were made," but were actually selling service and maintenance contracts and that the same was true of the charges for the options. While it is true that in determining these rentals and option prices the plaintiffs did not charge for the value of the sign, nevertheless they retained the title to the sign and were still renting it to the customer. If the customer should want to buy the sign after the expiration of the original rental period, the plaintiffs could, if they so desired charge a substantial price for it, regardless of the fact that as far as they were concerned it had no more value to them on the books and the entire amount of its original value to them had been paid for in the rental agreement. The material fact is that there is transferred the right to continuous possession of personal property the possession of which under a contract or lease would be taxable if an outright sale were made, and as we pointed out in the case of the original rental agreements, it is the charges for these agreements which are taxable and not the various elements which enter into the determination of these charges.

Cases remanded to the Tax Commission with directions to vacate part of the order reviewed herein and for such further proceedings not inconsistent with the views expressed herein. Each party to bear its own costs.

McDONOUGH, C. J., and HENRIOD and WORTHEN, JJ., concur.

CROCKETT, Justice (dissenting in part).

If the *cost of materials to the customer* represented only 6% of the total charge to the customer I would have no hesitancy in agreeing that the materials were merely incidental, as opposed to a substantial, part of the service.

It seems to me that if careful attention is given to the facts shown and to the exact wording of the stipulation, no one can possibly tell what percentage of the *charge to the customer* is represented by materials. It appears that the total sales for the period under audit were $244,986.01 and that of this the cost *to the company* of materials used was $14,698.75 which admittedly is about 6% of the total billings to customers. the significant and important fact is that it is not shown, nor can it be determined, at what price these *materials* were charged or billed *to the customer*. The stipulation states that the "fair selling price" would be a markup of 100%. It can be assumed that in making charges to the customer the company did mark up at least the 100% which would mean that customers were charged a total of $29,397.50, or 12% of the total billing. But under the stipulation, which merely recites that the fair selling price *would be* a 100% markup, without saying what the company did in fact *charge the customer*. The actual charge to the customer could be 30%, 50% or any other portion of the billing.

For instance, in a repair for which the customer was charged $10, the company could theoretically install a part costing the company 60 cents, use $5 labor to install it and bill the customer for $10, the additional $4.40 representing a profit on the part used. But under those facts the company could truthfully say that the cost of material *to the company* was only 6% of the total bill to the customer. The fact that the company does not say, and appear to be unwilling to specify on their billing, what portion of the *charge to the customer* represents service, and what portion represents charge for materials, leaves the way open for the company to actually make charges for, and therefore sell materials which in given instances may amount to a very high percentage, even approaching the total of a given bill, without collecting any sales tax therefor. The inequity of the situation and the unfairness to other taxpayers in failing to evenly distribute the tax burden is apparent.

From the foregoing it is obvious how important it is that the proportion of the materials bears to the total price should be gauged by the price of materials charged to the customer, rather than the amount it costs the seller.

It seems to me that the order made by the Commission with respect to the collection of tax on materials furnished in connection with the repair sales is so eminently fair, and so necessary from the standpoint of practical administration that it should be sustained. It simply required the company to collect 2% of the fair selling price of the materials if the company is willing to disclose what they are, and if the company is unwilling to do so, then imposes 2% of the total billing because it can't be told what the correct amount would be.

I would affirm the order of the Commission in its entirety.