BJ–TITAN SERVICES, Petitioner,

v.

STATE TAX COMMISSION,
Respondent.

No. 900368.

Supreme Court of Utah.

March 31, 1992.
Rehearing Denied June 5, 1992.

R. Paul Van Dam, Brian Tarbet, Salt Lake City, for State Tax Com'n.

· Randy M. Grimshaw, Maxwell A. Miller, Richard M. Marsh, Salt Lake City, for BJ–Titan.

STEWART, Justice:

BJ–Titan Services Company ("BJ–Titan") seeks review of the Utah State Tax Commission's ruling which imposed sales and use taxes on BJ–Titan's oil and gas well stimulation services and on a transfer of motor vehicles from BJ–Hughes Holding Company ("BJ–Hughes") to BJ–Titan. We reverse in part and remand.

## FACTS

The basic facts are undisputed. The appeal before the Commission involved two consolidated cases: *Hughes Tool Co. v. Auditing Division of the Utah State Tax Commission,* Appeal No. 88–1500, filed May 31, 1988, and *BJ–Titan Services Co. v. Auditing Division of the Utah State Tax Commission,* Appeal No. 88–1644, filed June 24, 1988. The Auditing Division of the Utah State Tax Commission assessed additional sales and use taxes against Hughes Tool Company in the amount of $239,842.89 for the period October 1, 1983, to March 31, 1985, and against BJ–Titan Service Company in the amount of $116,-574.11 for the period April 1, 1985, to September 30, 1986. BJ–Titan appealed the assessment to the Utah State Tax Commission.

In April 1985, Hughes Tool Company, through its holding company, BJ–Hughes, and Titan Services, Incorporated ("Titan Services"), combined to form BJ–Titan, a general partnership. BJ–Hughes contributed 72 percent of BJ–Titan's assets, and Titan Services contributed 28 percent. Ac-cordingly, BJ–Hughes received a 72 percent interest in the partnership, and Titan Services received a 28 percent interest. Assets contributed by BJ–Hughes included certain motor vehicles, titled and registered in Texas. BJ–Titan did not pay a sales and use tax on the vehicle transfers. The Auditing Division included the sales and use tax on the transfer in its assessment against BJ–Titan.

BJ–Titan provides oil and gas well stimulation and stabilization services. The well stimulation services generally consist of three different activities: cementing, hydraulic fracturing, and acidizing. Cementing is the placement of cement and other slurry compositions into various places in the well. BJ–Titan uses a special grade of Portland Cement in combination with any of 54 additives, depending on well conditions. The most important part of cementing is the injection of the cement slurry between the well hole and the well casing. Once poured, the cement permanently affixes the casing to the surrounding hole and cannot be removed. The cementing process stabilizes the well and isolates producing zones within the well. Hydraulic fracturing extends the bore laterally by injecting fluids into the well. Acidizing is an extension of hydraulic fracturing and uses hydrochloric acid in combination with other agents to improve well flow capacity. A substantial portion of BJ–Titan's audit deficiency relates to cementing services.[1]

BJ–Titan delivers its products to the well site and makes recommendations to the well operators regarding the precise formulas to be used and the method of placement in the well. Well operators decide whether to accept or reject the recommendations. Contracts between BJ–Titan and operators contain a specific provision which states that "work done by BJ–Titan shall be under the direction, supervision and control of the owner, operator, or his agent and BJ–Titan will perform the work as an independent contractor and not as an employee or agent of the owner or operator." BJ–Titan

---

1. According to BJ–Titan, cementing comprises 92 percent of the services involved in the audit deficiencies.

uses specialized equipment and trained personnel in providing stimulation services.

BJ–Titan bills customers for a lump sum and does not separately itemize labor and materials. The price, however, includes a charge for sales tax on the materials. BJ–Titan then remits the collected tax to the State Tax Commission. Based on the amount of tax remitted, the materials portion comprises on average about 30 percent of a total contract price. BJ–Titan does not pay sales tax on the materials it purchases.

The parties dispute exactly what BJ–Titan's customers purchase. The Commission contends that BJ–Titan's customers purchase the final product (the cement foundation and chemical materials) in the hole where it has its only value and that the product acquires value only after the materials and services together have been provided. BJ–Titan asserts that its customers actually purchase improved well performance, rather than the materials used to achieve that result.

## COMMISSION'S RULINGS

The Commission affirmed the Audit Division's assessment and denied BJ–Titan's petition. The Commission found that BJ–Titan had failed to establish by a preponderance of the evidence that oil and gas stimulation services and the transfer of motor vehicles from BJ–Hughes to BJ–Titan were exempt from sales and use tax. The Commission first concluded that "the portion of its product which BJ–Titan has labeled as services is really charges 'for fabrication or installation which is part of the process of creating a finished article of tangible personal property' (the cement which is sold to the well operators)...." The Commission further found, "Where the Petitioner is in the business of oil and gas stimulation, the Petitioner operates as a retailer of tangible personal property. The services that it provides to its customers in the sale of these products is a necessary component of the final product." Second, the Commission concluded that BJ–Titan was not a real property contractor within the meaning of the administrative rules

and, thus, was not exempt from sales and use taxes. Third, the Commission concluded that the transfer of motor vehicles was subject to sales and use taxes. Finally, the Commission concluded that BJ–Titan failed to establish that the Commission had a formal policy of taxing motor vehicle transfers on an aggregate basis, *i.e.*, taxing the value at the proportion of the noncontributing partner's equity ownership in the partnership.

## ISSUES ON APPEAL

The primary issues on appeal are whether the Commission erred (1) in determining that BJ–Titan operates as a retailer of tangible personal property in providing cementing, acidizing, and fracturing to its customers; (2) in concluding that BJ–Titan was not a real property contractor; (3) in determining that the transfer of vehicles was subject to sales and use taxes; and (4) in rejecting BJ–Titan's argument that the Commission had an established policy of taxing motor vehicle transfers on an aggregate basis.

## DISCUSSION

### Standard of Review

As the proceedings in these petitions commenced after January 1, 1988, the Utah Administrative Procedures Act ("UAPA"), Utah Code Ann. §§ 63–46b–1 to –22 (1989), governs the standards of review. *See* Utah Code Ann. § 63–46b–22 (1989); *Morton Int'l, Inc. v. Auditing Div. of Utah State Tax Comm'n*, 814 P.2d 581, 583 (Utah 1991); *Savage Indus., Inc. v. Utah State Tax Comm'n*, 811 P.2d 664, 668–69 (Utah 1991).

### Well Stimulation Services

We first address whether the Commission erred in determining that BJ–Titan operates as a retailer of tangible personal property in providing cementing, acidizing, and fracturing to its customers and, therefore, that sales and use taxes should be imposed on all charges billed to its customers. Because the tax was assessed for the

years 1983 to 1986, statutes from those years are controlling.

Since the 1930s, Utah law has imposed a tax on retail sales of tangible personal property. *See* Utah Code Ann. § 59–15–4(1) (Supp.1986) (currently § 59–12–103(1)(a) (1987 & Supp.1991)). The Code defines a retail sale as every sale by a retailer or wholesaler to a user or consumer and not for resale. *Id.* § 59–15–2(4), (5), (6), (7) (Supp.1986) (currently § 59–12–103(1)(a) (1987 & Supp.1991)). However, the Code exempts from tax sales of tangible personal property to a manufacturer which becomes an ingredient or component part of other tangible personal property. Utah Code Ann. § 59–15–2(7) (Supp.1986) (currently § 59–12–104(27) (Supp.1991)). Although the Legislature did not define the term "tangible personal property" until 1991, the Commission's rules in effect in 1986 defined it as "all tangible or corporeal things and substances which are dealt in or capable of being possessed or exchanged." Utah Admin.R. 865–26S (1986).[2]

A review of our case law analyzing these provisions reveals two emerging lines of theory. The first, known as the essence of the transaction theory, focuses on the nature of what was sold and whether it primarily entails tangible personal property. *See Mark O. Haroldsen, Inc. v. State Tax Comm'n*, 805 P.2d 176 (Utah 1990); *Snarr Advertising, Inc. v. Utah State Tax Comm'n*, 20 Utah 2d 55, 432 P.2d 882 (1967); *McKendrick v. State Tax Comm'n*, 9 Utah 2d 418, 347 P.2d 177 (1959); *Young Electric Sign Co. v. Utah State Tax Comm'n*, 4 Utah 2d 242, 291 P.2d 900 (1955); *see also Thorne and Wilson, Inc. v. Utah State Tax Comm'n*, 681 P.2d 1237 (Utah 1984). This theory examines the transaction as a whole to determine whether the essence of the transaction is one for services or for tangible personal property. The analysis typically requires a determina-

tion either that the services provided are merely incidental to an essentially personal property transaction or that the property provided is merely incidental to an essentially service transaction. Since the law imposes a tax only on the sale of tangible personal property, transactions that are essentially services are not taxable.[3]

The second theory, known as the ultimate user or consumer theory, focuses on whether a retail sale is made to a user or consumer and not for resale. *See Tummurru Trades, Inc. v. Utah State Tax Comm'n*, 802 P.2d 715 (Utah 1990); *Hardy v. State Tax Comm'n*, 561 P.2d 1064 (Utah 1977); *Sine v. State Tax Comm'n*, 15 Utah 2d 214, 390 P.2d 130 (1964); *Barrett Inv. Co. v. State Tax Comm'n*, 15 Utah 2d 97, 387 P.2d 998 (1964); *Ralph Child Constr. Co. v. State Tax Comm'n*, 12 Utah 2d 53, 362 P.2d 422 (1961); *Olson Constr. Co. v. State Tax Comm'n*, 12 Utah 2d 42, 361 P.2d 1112 (1961); *Nickerson Pump & Mach. Co. v. State Tax Comm'n*, 12 Utah 2d 30, 361 P.2d 520 (1961); *Union Portland Cement Co. v. State Tax Comm'n*, 110 Utah 135, 170 P.2d 164 (1946); *E.C. Olsen Co. v. State Tax Comm'n*, 109 Utah 563, 168 P.2d 324 (1946); *Utah Concrete Prods. Corp. v. State Tax Comm'n*, 101 Utah 513, 125 P.2d 408 (1942); *Western Leather & Finding Co. v. State Tax Comm'n*, 87 Utah 227, 48 P.2d 526 (1935). Unlike the essence of the transaction theory, this theory examines the nature, rather than the subject, of the transaction. The theory acknowledges that tangible personal property is often used in the process of making other property and in rendering services. The legal question posed is, who is the ultimate "user or consumer" of the tangible personal property? Transactions with the ultimate user or consumer are subject to sales tax. This analysis is based

---

2. The current Code defines tangible personal property, *inter alia,* as "all goods, wares, merchandise, produce, and commodities [and] all tangible or corporeal things and substances which are dealt in or capable of being possessed or exchanged." Utah Code Ann. § 59–12–102(13)(a)(i–ii) (Supp.1991).

3. However, the Code specifically levies sales tax on certain services: "all services for repairs, renovations, cleaning, or washing of tangible personal property or for the installation of tangible personal property rendered in connection with other tangible personal property." Utah Code Ann. § 59–15–4(1)(e) (Supp.1986).

on a presumed legislative intent to tax the last possible transaction.

A synthesis of these two theories and the cases decided under them reveals five distinguishable categories. The first category addresses whether the transaction is essentially a transfer of tangible personal property. These cases involve an inseparable combination of tangible property and services in developing the product and examine the essence of the transaction to determine whether the object of the transfer is tangible property or services. For example, in the repair of electric signs, the essence of the transaction is services, even though a part of the transaction includes a transfer of tangible personal property, such as wires, clips, and lights. *See Young Electric Sign Co. v. Utah State Tax Comm'n,* 4 Utah 2d 242, 291 P.2d 900 (1955). Similarly, the sale of custom-made advertising displayed on road signs owned by the seller is in essence a transaction for services, even though the sign itself is individually constructed for each sale. *See Snarr Advertising, Inc. v. Utah State Tax Comm'n,* 20 Utah 2d 55, 432 P.2d 882 (1967). In contrast, the sale of artificial limbs essentially entails a transaction for tangible personal property, even though part of the transaction includes fitting the limb and training the user. *See McKendrick v. State Tax Comm'n,* 9 Utah 2d 418, 347 P.2d 177 (1959). Also, the sale of customer lists on printed sheets and magnetic tapes is in essence a transfer of tangible personal property, even though the seller helps select and modify the lists. *See Mark O. Haroldsen, Inc. v. State Tax Comm'n,* 805 P.2d 176 (Utah 1990).

In analyzing cases in the first category, this Court has relied on several factors for determining whether the object of the transaction constitutes tangible personal property or services. These factors include (1) the value of the tangible property to the customer in relation to that of the services; (2) the cost of the property to the seller; (3) the customer's rights to possession or ownership of the property; (4) the ability to separately itemize charges for the property and services; (5) the extent to which the services increase the value of the property or to which the property increases the value of the services; and (6) the extent that such services are rendered in similar transactions. In these cases, we generally defer to the Commission's application of these factors and its determination of what constitutes the essence of a transaction. Accordingly, the Court will not overturn that determination unless it is unreasonable or arbitrary. *See Mark O. Haroldsen, Inc. v. State Tax Comm'n,* 805 P.2d 176, 181 (Utah 1990); *see also McKendrick v. State Tax Comm'n,* 9 Utah 2d 418, 347 P.2d 177, 178 (1959).

Cases falling within the other four categories stress the general question of who the user or consumer of tangible personal property is. These cases differ from the first category in that they involve transactions which include severable services and property portions. As noted above, the Code taxes only sales made to a user or consumer and not for resale. Also, the Code specifically exempts sales of ingredients and component parts used in manufacturing.

If these categories were placed on a taxation continuum or spectrum, the manufacturing category would be found at one extreme, where purchases are clearly not taxable. Manufacturers are not deemed consumers of tangible property transformed into their final products. For example, a corporation that assembles large water pumps from component parts is not a user or consumer of those parts; rather, the corporation's customers are. *See Nickerson Pump & Mach. Co. v. State Tax Comm'n,* 12 Utah 2d 30, 361 P.2d 520 (1961). The parts fit into the exemption for ingredients and component parts of manufactured products. The final product becomes tangible personal property which is more valuable than the sum of the components. Furthermore, assembly does not alter the identities of the parts.

An exception exists, however, for property and equipment used up in the manufacturing process. For example, a corporation that uses firebrick, iron grinding balls, and coal in manufacturing cement is the consumer of these items, even though particles

of each incidentally become part of the cement. *See Union Portland Cement Co. v. State Tax Comm'n*, 110 Utah 135, 170 P.2d 164 (1946). Similarly, a corporation that uses insecticides and boxes in preparing and delivering produce is the consumer of these items. *See E.C. Olsen Co. v. State Tax Comm'n*, 109 Utah 563, 168 P.2d 324 (1946). Such materials are consumed during the manufacturing process and are not intended to become ingredients or component parts of the finished product.

Near the manufacturing extreme is the auto repair category, where purchases are not taxable. Here, the customer, not the repairer, is the ultimate consumer of auto parts because the parts are installed without alteration and can be easily separated from the labor performed in installing them. A similar example is shoe repair where the customer, not the repairer, is the consumer of leather used in a repair job. *See Western Leather & Finding Co. v. State Tax Comm'n*, 87 Utah 227, 48 P.2d 526 (1935).

The professional services category falls in the middle of the spectrum, where some purchases are taxable and others are not. Here, tangible personal property used in providing professional services is consumed by the provider rather than the client. For example, a dentist is the consumer of materials used in his or her practice, such as plastics, cements, and metals, even though the patient is the end recipient of the property. *See Hardy v. State Tax Comm'n*, 561 P.2d 1064 (Utah 1977). To the extent that such materials cannot practically be itemized for individual patients, dentists are the last persons in the property chain who can be taxed. Similarly, a motel owner is the consumer of towels, blankets, soap, and other property used in the rental of rooms, even though the motel guest is the recipient of their use. *See Sine v. State Tax Comm'n*, 15 Utah 2d 214, 390 P.2d 130 (1964).

Contractors make up the final category and the other extreme of the spectrum. Here, purchases clearly are taxable. Al-though analytically similar to other labor-intensive businesses such as dentistry, the Court has developed a different rationale for resolving the issue of taxability for contractors. Contractors are deemed consumers of building materials used in the construction of buildings and other facilities. For example, contractors are consumers of concrete pipe, cinder blocks, and related concrete products used in the construction of highways and buildings, *Utah Concrete Prods. Corp. v. State Tax Comm'n*, 101 Utah 513, 125 P.2d 408 (1942), steel building materials used in the construction of buildings, *Olson Constr. Co. v. State Tax Comm'n*, 12 Utah 2d 42, 361 P.2d 1112 (1961), modular building units used in the construction of buildings out of the state, *Tummurru Trades, Inc. v. Utah State Tax Comm'n*, 802 P.2d 715 (Utah 1990), and telephone poles used in the construction of telephone systems; *Ralph Child Constr. Co. v. State Tax Comm'n*, 12 Utah 2d 53, 362 P.2d 422 (1961). Contractors are the last persons in the property chain to deal with the products before incorporation into a separate entity and before the products lose their identity as building materials. Also, they purchase the materials, not to resell them in their original form, but for the purpose of changing their nature from personal to real property. For this reason, the exemption for ingredients or component parts of tangible personal property does not apply to contractors. *Barrett Inv. Co. v. State Tax Comm'n*, 15 Utah 2d 97, 387 P.2d 998, 1000 (1964).[4]

In the instant case, the Commission taxed BJ–Titan's services because it found the services to be "a necessary component of the final product." The Commission stated, "The customer is purchasing the final product in the hole where it has its only value to the customer. The final product has value to the customers of BJ–Titan only after the materials and services together have been provided." With respect to cementing, the Commission found that "BJ–Titan synthesizes materials and servic-

---

**4.** The current code expressly removes real property from the definition of tangible personal property. Utah Code Ann. § 59–12–102(13)(b)(i) (Supp.1991).

es to provide a finished product which stabilizes the pipe located in the well." With respect to fracturing, acidizing, and nitrogen work,[5] the Commission found:

> In each of these services the personal property used in stimulation becomes part of the production of the well and is returned when oil and other fluids are taken from the well. In these cases, BJ–Titan has sold the products to the final consumer, and sales tax should have been collected on that sale to the final consumer.

BJ–Titan argues that the Commission's findings are erroneous because the services BJ–Titan provides are substantial and not incidental to the sale of tangible personal property. Section 59–15–4(1) implicitly grants the Commission some discretion in determining whether a certain transaction constitutes a sale of "tangible personal property." *See Morton Int'l, Inc. v. Auditing Div. of Utah State Tax Comm'n,* 814 P.2d 581, 588 (Utah 1991). Thus, in accordance with UAPA and our previous cases on this issue, we will not upset the Commission's determination that the essence of a transaction is tangible personal property unless it is unreasonable or arbitrary. Utah Code Ann. § 63–46b–16(4)(h)(i), (iv) (1989); *Mark O. Haroldsen, Inc. v. State Tax Comm'n,* 805 P.2d 176, 181 (Utah 1990); *McKendrick v. State Tax Comm'n,* 9 Utah 2d 418, 347 P.2d 177, 178 (1959).

■ With respect to the cementing services, the Commission could reasonably conclude that well operators intend to purchase the concrete in the well hole and that the services provided by BJ–Titan, such as developing the proper mixture of concrete slurry and injecting the mixture into the well, are incidental to that final product. In ruling as it did, the Commission had

before it the following facts: The value to the customer lies in the combination of materials and services each having little value without the other; the materials comprise on average 30 percent of the charge to a customer; well operators acquire possession, if not ownership, of the cement; BJ–Titan apparently has the ability to charge separately for the materials and the services, although it has not done so in practice; and such materials are not typically sold without the services.

These facts do not compel a conclusion that the cementing services rendered in this case are incidental to the product delivered. In a close decision such as this, we defer to the Commission's judgment. The Commission is in a better position to weigh the evidence and to assess an individual case in light of the many determinations that the Commission makes on close but different factual situations.[6]

■ With respect to the hydraulic fracturing and acidizing services, however, we hold that the Commission's determination that a well operator purchases in essence tangible personal property is unreasonable. Unlike cementing, fracturing and acidizing produce no finished tangible product. Chemicals are injected into the well to stimulate well flow and returned as part of production when oil and other fluids are taken from the well. The well operator is not concerned with retrieving the chemicals, or the use of any particular chemical. The value to the customer lies purely in the service, not in the chemicals, and there is no real transfer of possession or ownership of the chemicals. Therefore, the essence of BJ–Titan's fracturing and acidizing services is providing services, not tangible personal property, and the chemicals con-

---

5. Although the Commission included "nitrogen work" in this finding, the parties have not discussed this service in any detail. Trade materials submitted in the record indicate that nitrogen is used to extend fracturing and acidizing and as an ingredient in cementing. We assume that in using "nitrogen work," the Commission meant nitrogen services as similar to fracturing and acidizing. We therefore treat it as such.

6. We note that the cement used by BJ–Titan falls within the Commission's definition of "tangible personal property," *i.e.,* "all tangible or corporeal things and substances which are dealt in or capable of being possessed or exchanged." Utah Admin.R. 865–26S (1986).

sumed in providing those services are merely incidental and thus not taxable. Because the Commission did not determine what proportion of the tax deficiencies relate to cementing and what proportion relate to fracturing and acidizing, we remand for that determination.

■ We next address whether the Commission erred in determining that BJ–Titan is not a real property contractor. BJ–Titan argues that it converts tangible personal property, cement, into real property, and therefore, it is a real property contractor that should have paid sales tax on its purchases of the materials used to produce the cement. As noted above, BJ–Titan billed its customers for a lump sum, without itemizing labor and materials. Each price, however, included a charge for sales tax on the materials used. BJ–Titan did not pay sales tax on the purchases of the raw materials. The Commission concluded that these practices, "were not those of a real property contractor but were those of a retail sales business which purchased the materials for later resale."

The different treatment applied to real property contractors is based on the proposition that building materials lose their identity as such when they become part of a building or facility. In other words, they are converted from tangible personal property into real property. The issue is not, as BJ–Titan urges, which party to the transaction converted the cement into real property, but rather, who is the ultimate user or consumer of the cement. Because the essence of the transaction between BJ–Titan and a well operator is tangible personal property, BJ–Titan purchased the raw materials used in producing its cement not for consumption, but for resale, and the labor expended in producing the final product merely increased the sales value of that product. The ultimate consumer is the well operator. In this respect, BJ–Titan is like a concrete mixing company hired to arrive at a site and pour concrete into a hole dug by and between forms erected by the general contractor, who is the consumer of the cement. The contractor purchases delivered and poured concrete and leaves the formulation of the blend of ingredients to the concrete provider, as conditions require. The labor expended in producing and pouring the concrete and the cost of delivery are all included in the price.

Moreover, a well operator is in the business of making wells produce. The well operator contracts with BJ–Titan to obtain a concrete anchor around the well casing which stabilizes the well and isolates zones of production identified by the operator. The operator provides BJ–Titan with all the necessary well data and runs the cementing equipment down the bore. In essence, the well operator purchases a certain amount of cement at a certain location in the well. It does not seek to purchase real property, nor does the cement become inseparably meshed into a greater facility which itself is the object of the transaction. From the standpoint of the well operator, who may or may not own the well, the cement has not lost its identity as tangible personal property.

### Vehicle Transfer

■ Finally, we address whether the Commission erred in holding that the transfer of vehicles from BJ–Hughes to BJ–Titan was subject to sales tax.

BJ–Titan is a Texas general partnership established in 1985 by BJ–Hughes Holding Company and Titan Services Incorporated. In forming BJ–Titan, BJ–Hughes contributed 72 percent of the assets and Titan Services contributed 28 percent. Among the assets transferred by BJ–Hughes were motor vehicles titled and registered in Texas. The Commission found that this transfer was properly taxed. We affirm.

The Sales Tax Act levies a tax on every retail sale of tangible personal property made within the state. Utah Code Ann. § 59–15–4(1)(a) (Supp.1986). The term "retail sale" means every sale within the state of Utah by a retailer or wholesaler to a user or consumer, unless otherwise exempted. *Id.* § 59–15–2(6). Expressly excluded from the definition of a retail sale are "isolated [and] occasional sales by persons not regularly engaged in business." *Id.* However, a sale of a vehicle "of a type

required to be registered under the provisions of the motor vehicle laws of this state" is not an isolated or occasional sale, unless it is a transfer "in a business reorganization where the ownership of the transferee organization is substantially the same as to the ownership of the transferor organization." *Id.*

BJ–Titan first argues that its vehicles are not "of a type required to be registered," citing an exception to registration for interstate commercial vehicles duly registered in another state and not owned by a state resident. Because this issue was not raised before the Commission, we decline to address it.

BJ–Titan next argues that the transfer of motor vehicles is exempt from sales tax because the transfer occurred in a business reorganization where the ownership of the transferee organization is substantially the same as the transferor organization. To be excepted from sales tax under § 59–15–2(6), there must first be a "business reorganization" and second the ownership of the transferee must be "substantially the same" as the ownership of the transferor. The Act does not define either "business reorganization" or "substantially the same."

The Commission concluded that the transfer of assets from two business entities to form and organize a new legal entity is not a business reorganization. Rather, the two original entities have formed a new and separate entity. The Commission also concluded that the ownership of BJ–Titan, the transferee, is not substantially the same as the ownership of BJ–Hughes, the transferor, because BJ–Hughes held less than an 80 percent interest in BJ–Titan. The 80 percent figure represents an informal policy of the Auditing Division based on the Internal Revenue Code. Because this is primarily a question of statutory interpretation, we will grant relief only if the Commission has erroneously interpreted the law. *See* Utah Code Ann. § 63–46b–16(4)(d) (1989).

The general rule on reorganizations is as follows:

A reorganization ... is not ordinarily the combination of several existing corporations, but is simply the carrying out by proper agreements and legal proceedings of a business plan or scheme for winding up the affairs of, or foreclosing a mortgage or mortgages upon, the property of insolvent corporations, and the organization of a new corporation to take over the property and business of the distressed corporation.

19 Am.Jur.2d *Corporations* § 2514 (1986). Clearly, under this rule, a transfer of assets by two separate entities to create a partnership, a new legal entity, is not a "business reorganization." However, even assuming that a reorganization includes the transfer of assets by one corporation to another entity, the ownership of the transferee and transferor in this case is not substantially the same.

The chapter on franchise and privilege taxes in the 1986 Code defined "reorganization" for the purposes of §§ 59–13–13 and 59–13–14 to include "[a] transfer by a corporation of all or a part of its assets to another corporation, if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred...." Utah Code Ann. § 59–13–12(9)(a) (Supp. 1986). The Code defined the term "control" as "the ownership of at least eighty per cent of the voting stock and at least eighty per cent of the total number of shares of all other classes of stock of the corporation." *Id.* § 59–13–12(10).

In the instant case, BJ–Hughes received a 72 percent interest in BJ–Titan. We believe the 80 percent requirement adopted by the Commission is reasonable in light of the definition in the franchise and privilege taxes chapter of the Utah Code.

BJ–Titan also argues for the first time on appeal that the transfer was not a "sale," because BJ–Hughes owned the same assets before and after the transfer and, thus, there has been no consideration for a sale to have taken place. Because the issue was not raised before the Com-

mission, we decline to address it.[7]

 Finally, BJ–Titan asserts that the Commission had a policy of taxing motor vehicle transfers on an aggregate basis and that the Commission erred in allowing the Auditing Division to deviate from that policy. The "aggregate" rule assesses sales tax on the value of assets transferred to a partnership based on the non-contributing partner's equity ownership in the partnership. By contrast, the "entity" rule, used by the Auditing Division, assesses the tax at the whole value of the transfer.

Under UAPA, we will grant relief where an agency action is "contrary to the agency's prior practice, unless the agency justifies the inconsistency by giving facts and reasons that demonstrate a fair and rational basis for the inconsistency." Utah Code Ann. § 63–46b–16(4)(h)(iii) (1989). To be entitled to relief, however, a party must show that the agency's prior practice is firmly established. *See Morton*, 814 P.2d at 595. The Commission found that the evidence presented by BJ–Titan, the opinion testimony of a single witness, was insufficient to establish that the Auditing Division followed an aggregate policy. BJ–Titan argues that the Commission "cavalierly ignored" a memorandum written by the witness while she was still an employee with the Commission and an informal opinion from the Attorney General's office. We have reviewed this evidence and the record and affirm as reasonable the Commission's finding that the aggregate rule was not a formal policy.

## CONCLUSION

We affirm the Commission's ruling that the cementing services provided by BJ–Titan are subject to sales and use taxes. We reverse the Commission's ruling that the fracturing and acidizing services provided by BJ–Titan are taxable and remand for a division of deficiencies attributable to cementing, fracturing, and acidizing. We affirm the Commission's ruling that the transfer of motor vehicles from BJ–Hughes to BJ–Titan was subject to sales and use taxes.

Reversed in part and remanded.

HALL, C.J., HOWE, Associate C.J., and DURHAM and ZIMMERMAN, JJ., concur.

---

7. BJ–Titan relies on three cases: *Northern Telecom, Inc. v. Olsen*, 679 S.W.2d 448 (Tenn.1984); *IBEC Indus., Inc. v. Lindley*, 62 Ohio St.2d 279, 405 N.E.2d 289 (1980) (per curiam); *Roberts & Sons, Inc. v. Kosydar*, 42 Ohio St.2d 495, 330 N.E.2d 437 (1975) (per curiam). In *Northern Telecom*, a subsidiary corporation was absorbed into the parent corporation and registration of an aircraft owned by the subsidiary was transferred to the parent. The court held that no sale for consideration occurred and that the transfer of title was not subject to sales tax:

> The record discloses that as a result of the transaction Northern Telecom, Inc.'s position was not changed; it continued to have complete control over the same assets; it gave up nothing, no money or other consideration was exchanged. Nothing was effected other than an internal corporate reorganization. The subsidiary received nothing for its transfer of assets to the parent; indeed, following the transaction there was no subsidiary to receive a consideration.

*Northern Telecom*, 679 S.W.2d at 449.

In *IBEC*, the court held that a transfer of vehicles from a corporation to a new wholly owned subsidiary was not a sale for sales tax purposes because it lacked consideration. The court reasoned that there was "merely a shifting of assets by a corporation from one division to another." *IBEC*, 405 N.E.2d at 290. In *Roberts & Sons*, a partnership transferred all its assets to a newly formed corporation. In the transaction, certain vehicles were issued new titles and registrations. The court held that no sale of the vehicles had occurred for purposes of sales tax because "[t]here is nothing in the record in this case to indicate that there was any 'consideration' or 'price' paid for the vehicles." *Roberts & Sons*, 330 N.E.2d at 438. However, for a transfer similar to that in *IBEC* in which the court held that consideration was present, see *Hawthorn Mellody, Inc. v. Lindley*, 65 Ohio St.2d 47, 417 N.E.2d 1257, 1262–63 (1981).

These cases necessarily turn on a question of fact: Was there consideration for the transfer of assets? To make this determination, the terms and circumstances of the transactions must be examined. Because this argument was not presented to the Commission below, a finding of fact on consideration has not been made, and we will not indulge in such evidentiary endeavors.