**EATON KENWAY, INC., Petitioner,**

v.

**AUDITING DIVISION OF the UTAH STATE TAX COMMISSION, Respondent.**

No. 940126.

Supreme Court of Utah.

Nov. 6, 1995.

F. Lavar Christensen, Salt Lake City, for petitioner.

Jan Graham, Atty. Gen., Susan L. Barnum, Asst. Atty. Gen., Salt Lake City, for respondent.

Maxwell A. Miller, Kent Winterholler, Salt Lake City, for amici Utah Manufacturers Association and Utah Taxpayers Association.

HOWE, Justice:

Petitioner Eaton Kenway, Inc. (Eaton), seeks review of a decision by the Utah State Tax Commission assessing sales tax on Eaton's purchase of a new manufacturing machine and its conversion of engineering drawings to computer disks.

Utah levies a tax on "retail sales of tangible personal property made within the state." Utah Code Ann. § 59–12–103(1)(a). The Auditing Division of the Commission conducted a sales and use tax audit of Eaton's operations for the period from April 1989 until March 1992. Following this audit, the Division assessed sales taxes on (1) a computer numerically controlled (CNC) machine, and (2) computer disks containing scanned drawings.[1] Eaton disagreed with the assessments on appeal.

---

1. The Division also assessed sales and use taxes on two other items that are not before this court

and requested a hearing before the Commission. The Commission conducted a formal evidentiary hearing and issued a final decision affirming the assessments. Eaton seeks our review. We examine the two items separately.

## I. CNC MACHINE

### A. Facts

Eaton is a manufacturer of automated guided vehicle systems (AGVs) and storage/retrieval vehicles (SRVs). These mechanical vehicles are typically used in warehouse settings to perform forklift-type maneuvers. In 1988, Eaton decided to devote more money to the research and development of its products to better compete with its competitors and to stay ahead of the industry. As a result of this changed direction, Eaton's research and development team began designing improved AGVs and SRVs.

Prior to purchasing the CNC machine, Eaton used six machines which required manual assistance to complete cutting and drilling tasks, making exact duplication of parts difficult. These machines required operators to stop and restart them with every tool change and angle adjustment, and the machines could not cut long sections of steel. The machines were in fair to good condition and ranged from twelve to twenty years old. They were capable of producing the old product line satisfactorily and were not necessarily outdated equipment.

Six days after retiring these machines, Eaton installed the new CNC machine. The computerized machine was purchased to meet an increased production schedule, reduce production costs, and meet the closer tolerances required to produce the new product line. It is able to drill, cut, and tap holes with extreme accuracy and speed. It automatically changes drill ends without manual intervention. Thus, it is able to make parts that the previous six machines were incapable of producing and enables Eaton to develop stronger, quicker, and more stable AGVs and SRVs. With the CNC machine in operation, Eaton reduced production time by fifty percent. As a result, Eaton reduced its manufacturing personnel in its machine shop.

### B. Analysis

Eaton contends that the purchase of the CNC machine is exempt from sales tax under Utah Code Ann. § 59–12–104, which provides:

> The following sales and uses are exempt from the taxes imposed by this chapter:
>
> . . . .
>
> (15) sales or leases of machinery and equipment purchased or leased by a manufacturer for use in new or expanding operations (excluding normal operating replacements, which includes replacement machinery and equipment even though they may increase plant production or capacity, as determined by the commission) in any manufacturing facility in Utah.... For purposes of this subsection, the commission shall by rule define "new or expanding operations"....

Utah Code Ann. § 59–12–104 (Supp.1993) (emphasis added).[2]

█ We apply a correction of error standard to the Commission's conclusions of law, except where "there is an explicit grant of discretion contained in a statute at issue." Utah Code Ann. § 59–1–610(1)(b). When the legislature explicitly grants discretion to the Commission, as it did in the underlined portions of section 59–12–104(15) above, we review the Commission's actions under a reasonableness standard. *Union Pac. R.R. v. Auditing Div.*, 842 P.2d 876, 881 (Utah 1992) (citing *Morton Int'l, Inc. v. Auditing Div.*, 814 P.2d 581, 587–89 (Utah 1991)).

The statute distinguishes between tax-exempt "new or expanding operations" and taxable "normal operating replacements." Both of these terms have been defined by administrative rule:[3]

---

2. In 1995, the legislature expanded the exemption to phase in "normal operating replacements." Utah Code Ann. § 59–12–104(16)(a)(ii) (Supp.1995). Nevertheless, this change does not affect the dispute before us.

3. In addition to the explicit grants of authority in section 59–12–104(15), the Commission is given general authority to promulgate rules to aid in the interpretation and enforcement of the tax

*"New or expanding operations"* means manufacturing, processing, or assembling activities which:

(a) are substantially different in nature, character, or purpose from prior activities;

(b) are begun in a new physical plant location in Utah; or

(c) increase production or capacity. This definition is subject to limitations dealing with normal operating replacements.

. . . .

*"Normal operating replacements"* means machinery or equipment which replaces existing machinery or equipment of a similar nature, even if the use results in increased plant production or capacity.

(a) If new machinery or equipment is purchased or leased which has the same or similar purpose as machinery or equipment retired from service within 12 months before or after the purchase date, such machinery or equipment is considered as replacement and is not exempt.

(b) If existing machinery or equipment is kept for back-up or infrequent use; new, similar machinery or equipment purchased would be considered as replacement and is not exempt.

Utah Admin.Code R865–19–85S(A)(3), (6) (1993) (emphasis added).[4]

The parties stipulated that Eaton qualified as a "manufacturing facility," thereby meeting the threshold requirement of the exemption. *See* Utah Code Ann. § 59–12–104(15). However, the Commission concluded that the CNC machine was not a part of tax-exempt "new or expanding operations" but instead was a taxable "normal operating replacement."

laws. Utah Code Ann. §§ 59–1–210(2)–(3), 63–46a–3(2).

**4.** We note that rule 865–19–85S(A)(3) has since been amended. *See* Utah Admin.Code R865–19S–85(A)(3) (1995). The revised rule is not applicable to this case.

### 1. Validity of Administrative Rule

Eaton and amici Utah Taxpayers Association and Utah Manufacturers Association—who have also filed a brief in this case—contend that the Commission's definitions for "new or expanding operations" and "normal operating replacements" in rule 865–19–85S(A)(3) and (6) are invalid because they are inconsistent with the statute establishing the exemption. A recent court of appeals decision supports this contention. In *Newspaper Agency Corp. v. Utah State Tax Commission,* 892 P.2d 17 (Utah Ct.App.1995), *petition for cert. filed,* May 1, 1995, the Newspaper Agency Corporation (NAC) sought review of an assessment of sales tax on its purchases of new machinery and equipment. The new purchases greatly increased NAC's printing capacity. *Id.* at 19. The Commission affirmed the assessment, concluding that NAC did not meet any of the three subparts of rule 865–19–85S(A)(3) defining "new or expanding operations." *Id.* at 20. The court of appeals reversed, holding that each of the three tests under the rule is invalid as contrary to the statute establishing the exemption. *Id.* at 21–22. On the basis of its reading of the exemption, the court concluded that NAC was entitled to the exemption because its purchases were part of "new or expanding operations." *Id.* at 23.[5]

In reviewing the validity of the administrative rule, we note that *Newspaper Agency* acts as persuasive authority, but we are not bound under the doctrine of stare decisis to follow it. *Consolidation Coal Co. v. Utah Div. of State Lands & Forestry,* 886 P.2d 514, 525 n. 14 (Utah 1994) ("This court is never bound by decisions of the court of appeals and does not need to overcome any particular hurdles in overruling them."). We begin with the presumption that the Commission's rule is valid and reasonable. *State v. Utah Merit Sys. Council,* 614 P.2d 1259, 1263 (Utah 1980). However, we will invalidate a rule that is not in harmony with its govern-

**5.** In *Newspaper Agency,* the machinery and equipment exemption was numbered at section 59–12–104(16) instead of at subsection (15). *See Newspaper Agency,* 892 P.2d at 19 n. 1.

ing statute. *Sanders Brine Shrimp v. Audit Div.*, 846 P.2d 1304, 1306 (Utah 1993) (holding administrative rule impermissibly narrowed availability of tax exemption). We also recognize that a tax exemption is strictly construed against the taxpayer, but with sufficient latitude to accomplish the exemption's intended purpose. *Hales Sand & Gravel, Inc. v. Audit Div.*, 842 P.2d 887, 890 (Utah 1992); *Utah County v. Intermountain Health Care, Inc.*, 725 P.2d 1357, 1359 (Utah 1986).

The Commission allows the sales tax exemption to manufacturers that satisfy at least one of the three subparts of rule 865–19–85S(A)(3) as "new or expanding operations." Eaton contends that the purchase of the CNC machine qualifies for the exemption under subparts (a) and (c) of the rule. We examine the validity of these two subparts.

■ Subpart (a) allows an exemption if the purchased machinery or equipment is used in manufacturing activities that "are substantially different in nature, character, or purpose from prior activities." Utah Admin.Code R865–19–85S(A)(3)(a). In *Newspaper Agency,* the court of appeals held that this subpart is invalid because it is inconsistent with the usually accepted meaning of the word "expand." 892 P.2d at 21. However, the statute exempts "new *or* expanding operations." While subpart (a) may exclude "expanding operations," it reasonably defines "new operations." "Expanding operations" are dealt with in subpart (c). We emphasize that for a sale to qualify for this exemption, it need not satisfy each of the three subparts. In other words, a sale will be exempt if it qualifies under one of the subparts, even if it fails under the other two subparts. We conclude that subpart (a) reasonably defines "new operations" and is therefore valid.

■ Subpart (c) allows an exemption if the purchased machinery or equipment is used in manufacturing activities that "increase production or capacity ... subject to limitations dealing with normal operating replacements." Utah Admin.Code R865–19–85S(A)(3)(c). We conclude that this subpart reasonably defines "expanding operations" as manufacturing activities that "increase production or capacity" and that it properly excludes tax-

able "normal operating replacements," a term taken directly from section 59–12–104(15).

■ The Commission's definition of "normal operating replacements," however, requires further review. Rule 865–19–85S(A)(6) defines this term as "machinery or equipment which replaces existing machinery or equipment of a similar nature," even though increased plant production or capacity may occur. Two tests are then provided which further define the exemption. The new machinery or equipment is considered a taxable "normal operating replacement" if it is of a similar nature to the replaced machinery or equipment and the replaced machinery or equipment is (a) "retired from service within 12 months before or after the purchase," or (b) "kept for back-up or infrequent use."

Eaton and the amici associations contend that this definition is invalid because it is too broad in that it denies the exemption to a manufacturer seeking to upgrade and modernize existing equipment. They argue that only those manufacturers who replace equipment that is worn out or obsolete should be denied the exemption. Thus they assert that rule 865–19–85S(A)(6) narrows the exemption bestowed by section 59–12–104(15). This is also the position taken by the court of appeals in *Newspaper Agency,* 892 P.2d at 22.

We begin by examining the plain language of the statute granting the exemption, *Neel v. State,* 889 P.2d 922, 925 (Utah 1995), while construing it so that it is in harmony with its overall legislative objective. *Nixon v. Salt Lake City Corp.,* 898 P.2d 265, 268 (Utah 1995); *Utah State Road Comm'n v. Friberg,* 687 P.2d 821, 831 (Utah 1984). Section 59–12–104(15) denies the exemption to "normal operating replacements, which includes replacement machinery and equipment even though they may increase plant production or capacity." While this language is wordy, we conclude that the legislative intent was to deny the exemption to normal operating replacements of machinery and equipment even though they may increase plant production or capacity.

After examining the exemption, we do not agree with Eaton and amici that it should apply broadly to manufacturers upgrading and modernizing existing machinery and equipment. We also reject the contention that the only taxable replacements are those that replace machinery and equipment that are worn out or obsolete. The term "normal operating replacements" obviously does not refer to all replacements. Instead, the term suggests substitutions normally made in the regular course of business. Modernizing and upgrading machinery and equipment are normally done in the regular course of business, even though the replaced items may be in good working order (and thus are not worn out) and still serve a practical purpose (and thus are not obsolete). Notably, the statute does not simply deny the exemption to normal operating replacements—but "normal operating replacements ... *even though they may increase plant production or capacity.*" Utah Code Ann. § 59–12–104(15) (emphasis added). This language indicates that the legislature intended to deny the exemption to purchases of replacements normally made in the regular course of business, even though through advanced technology the replacement machinery and equipment are more efficient and productive.

This interpretation is consistent with the legislative intent of the exemption: to encourage manufacturing facilities to locate and expand their operations in Utah.[6] Granting exemptions on the purchase of all replacements except those replacing obsolete or worn-out machinery and equipment would not necessarily reach this goal. Instead, existing Utah manufacturers would receive tax benefits on the purchase of certain machinery and equipment—e.g., those replacing items that are somewhat outdated but still operable—without necessarily encouraging additional development within the state. By its rules, the Commission has in effect interpreted the legislative exemption of sales or leases of machinery and equipment used in an expanding operation to mean either (1) additional pieces of machinery or equipment or (2) replacement machinery or equipment

of a dissimilar nature to the machinery or equipment that it replaced. Consistent with that interpretation, the Commission has determined that the legislature did not intend to exempt machinery and equipment purchased to modernize existing facilities or to maintain a competitive advantage because that can be accomplished without having "new or expanding operations."

Rule 865–19–85S(A)(6) properly limits "normal operating replacements" to machinery and equipment which replace existing machinery and equipment of a "similar nature." Replacements that are not of a "similar nature" are not "normal operating" replacements and thus are eligible for the exemption. The rule's two subsections appropriately and adequately focus on whether new purchases are similar "replacements." Accordingly, we conclude that rule 865–19–85S(A)(6) is reasonable and fairly defines "normal operating replacements."

2. Entitlement to the Exemption

█ We proceed to discuss Eaton's entitlement to the exemption. Eaton contends that the purchase of the CNC machine qualifies for the exemption under rule 865–19–85S(A)(3)(a). Subpart (a) allows an exemption if the CNC machine is used in a new operation which is defined as manufacturing activities that "are substantially different in nature, character, or purpose from prior activities." The Commission concluded:

The CNC machine was not a part of manufacturing, processing or assembling activities which are substantially different in nature, character, or purpose from Eaton Kenway's prior activities. Petitioner manufactured the same type of product both before and after the purchase of the CNC machine. The product produced by the CNC machine was the same make, only a different model....

... [T]he manufacturer's sales tax exemption does not extend to purchasers such as this one where a manufacturer has merely bought the latest technologically

6. See H.B. 103, 46th Leg., Gen.Sess. § 3 (1985) (statements by Representatives DeMann, Holt, and Karras).

improved machine to help it compete in its same field of business.

Eaton argues that the CNC machine dramatically changed the nature and character of the company's manufacturing operations. For example, the cutting, drilling, and tapping of holes were all previously done by hand, while the CNC machine performs these functions automatically. In addition, amici argue that the Commission's stated reasons for denying the exemption under subpart (a) imposes a "new product" test even though the rule contains no such requirement.

As explained above, subpart (a) targets "new"—not "expanding"—operations. While the CNC machine enabled Eaton to manufacture products with more technological precision and improvements, it performed essentially the same tasks performed by the six older machines: cutting, drilling, and other fabrication tasks. That Eaton produced AGVs and SRVs before and after the CNC machine was purchased is a relevant factor to examine, although is by no means dispositive. Overall, however, we agree with the Commission that Eaton's present activities cannot properly be described as "substantially" different in nature, character, or purpose from prior activities.

 Eaton also contends that the purchase of the CNC machine qualifies for the exemption under rule 865–19–85S(A)(3)(c). Subpart (c) allows an exemption if the purchased machinery or equipment is used in an expanding operation which is defined as manufacturing activities that "increase production or capacity," as long as, according to rule 865–19–85S(A)(6), it does not "replace[ ] existing machinery or equipment of a similar nature." The CNC machine clearly replaced the six older machines. Furthermore, the replaced machines were unquestionably of a similar nature to the new one. All of them were designed to cut, drill, and tap component parts for Eaton's AGVs and SRVs. The new machine meets the definition of a normal operating replacement contained in rule 865–19–85S(A)(6)(a) as the six older machines

were "retired from service" just days before the CNC machine was purchased, well within the twelve months proscribed by the rule.[7] Even though the new machine clearly increased Eaton's production and capacity, the Commission correctly found that the CNC machine replaced "existing machinery or equipment of a similar nature." Utah Admin.Code R865–19–85S(A)(6). Thus the CNC machine does not meet the requirements of subpart (c).

In sum, Eaton sought to stay competitive in its field by purchasing a new machine with faster, more advanced manufacturing abilities. The investment gives Eaton the ability to efficiently produce a superior product line, but it cannot properly be termed a new or expanding operation. The exemption was enacted to encourage new manufacturers to locate in Utah and existing manufacturers to expand their operations, not to upgrade existing operations. Eaton's upgrade does not qualify as "new or expanding operations," "even though" the purchase increased its production or capacity. The legislature has specifically determined that "increased plant production and capacity" are not alone sufficient to qualify for the exemption. Utah Code Ann. § 59–12–104(15). We conclude that the CNC machine does not qualify for the exemption under section 59–12–104(15).

## II. COMPUTER DISKS

Eaton created engineering drawings as a part of its production process. To store these drawings on its computer system, Eaton needed to transfer the drawings to computer disks. Lacking the necessary equipment, it sent its drawings to a third party, Auto–Scan, to electronically scan and place the drawings on the disks. Auto–Scan did not manipulate the drawings in any way other than to change their form to floppy disk.

Rule 865–19–92S of the Utah Administrative Code governs whether these disks are taxable. It provides:

　(A) Definitions

　　. . . .

---

7. Rule 865–19–85S(A)(6)(b) does not apply because the six older machines were not "kept for

back-up or infrequent use."

(3) "Computer-generated output" means the microfiche, microfilm, paper, discs, tapes, molds, or other tangible personal property generated by a computer.

. . . .

(E) The sale of computer generated output is subject to the sales or use tax if the primary object of the sale is the output and not the services rendered in producing the output.

The Commission concluded that Eaton purchased "computer generated output" in the form of tangible floppy disks and that these purchases were taxable. We grant this conclusion no deference and review it for correction of error. Utah Code Ann. § 59–1–610(1)(b).

■ Eaton first argues that the computer disks did not constitute "computer generated output." We disagree. Rule 865–19–92S(A)(3), the validity of which Eaton does not question, plainly defines the term to include "discs ... generated by a computer." The floppy disks here were generated by an Auto–Scan computer.

■ Next Eaton contends that the disks qualify as tax-exempt "custom computer software." Again we disagree. " 'Custom computer software' means a program or set of programs designed and written specifically for a particular user. The program must be customer ordered and can incorporate preexisting routines, utilities, or similar program components." Utah Admin.Code R865–19–92S(A)(2). Auto–Scan did not write a program for Eaton. Although the disks were uniquely intended for Eaton, Auto–Scan did not create for Eaton a set of instructions designed to run a routine. In fact, Auto–Scan did not manipulate the drawings in any way but merely transferred drawings into a computer-readable form. Interestingly, Eaton admits in its brief that it "did not receive any new software." These facts are inconsistent with the rule's definition of "custom computer software."

Finally, Eaton contends that its purchase of the disks is not taxable because the primary object of the sale was the services rendered in producing the disks. It points out that Auto–Scan's only "service" was to electronically scan the drawings and convert them to computer disks, without any manipulation of the information. The Commission responds that Eaton's sole purpose was to obtain the converted drawings in some computer-readable form, which required only incidental services by Auto–Scan employees.

Administrative rule 865–19–92S(E) requires us to determine whether the "primary object" of the Eaton/Auto–Scan transaction was the disks or Auto–Scan's services in producing the disks. While this court has not discussed this particular administrative rule before, the "primary object" or "essence of the transaction" test has been applied in a number of cases. For instance, in *Young Electric Sign Co. v. Utah State Tax Commission*, 4 Utah 2d 242, 244, 291 P.2d 900, 902 (1955), we held that the repair of electric signs is principally a nontaxable service and that replacement parts and materials were incidental to the personal services required. Likewise, in *Snarr Advertising, Inc. v. Utah State Tax Commission*, 20 Utah 2d 55, 58, 432 P.2d 882, 885 (1967), we held that custom billboards are essentially a nontaxable transaction for services. In contrast, in *McKendrick v. State Tax Commission*, 9 Utah 2d 418, 420, 347 P.2d 177, 179 (1959), we held that the sale of artificial limbs essentially entails a taxable transaction for tangible personal property, even though part of the transaction includes fitting the limb and training the user.

More recently, we addressed the sale of computerized customer lists in *Mark O. Haroldsen, Inc. v. State Tax Commission*, 805 P.2d 176 (Utah 1990). In that case, the taxpayer purchased mailing lists from several brokerage companies to market products through direct mail advertising. The brokers compiled the lists according to specific requirements determined by the taxpayer. *Id.* at 177. The district court held that the mailing lists were taxable as the "real object" of the transaction and that the brokers' services were merely incidental to the sale. *Id.* This court affirmed, holding that "[a]lthough the brokers provided some service in selecting and modifying the lists, those services were not the essence of the transactions. . . .

What [the taxpayer] wanted was to receive the mailing lists." *Id.* at 181.

Unlike the taxpayer in *Haroldsen* who purchased the information on the mailing lists, here Eaton always owned the engineering drawings. It merely wanted the information to be scanned and converted into a computer-readable form. Notably, the cost of the disks to Auto–Scan was minimal, and the disks were of no value to Eaton until after Auto–Scan performed the scanning and converting services. Thus, Auto–Scan's services greatly increased the value of the property. We have previously relied on these considerations in determining the primary object of the transaction. *See BJ–Titan Servs. v. State Tax Comm'n,* 842 P.2d 822, 828–29 (Utah 1992) (holding cement work taxable while holding other oil and gas well stimulation services exempt).

The disks here were simply a method of returning to Eaton the data, documents, and information which Eaton had supplied and the ownership of which it had not relinquished. The transaction was primarily a service, not a new taxable purchase of "tangible personal property" that the customer did not previously own. We conclude that Eaton's purchase of the computer disks is not taxable because the primary object of the sale was the services rendered in producing the disks, not the disks themselves.

The Commission's decision is affirmed in regard to the taxable CNC machine and reversed in regard to the tax-exempt scanning services.

ZIMMERMAN, C.J., DURHAM and RUSSON, JJ., and LOW, District Judge, concur in Justice HOWE's opinion.

STEWART, Associate C.J., having disqualified himself, does not participate herein; GORDON J. LOW, District Judge, sat.