1999 UT 9

**Michael McBRIDE and Jay Brummett, Petitioners,**

v.

**MOTOR VEHICLE DIVISION OF UTAH STATE TAX COMMISSION and Utah State Tax Commission, Respondents.**

No. 960422.

Supreme Court of Utah.

Jan. 29, 1999.

Brian M. Barnard, Andrea J. Garland, Natasha Hawley, Salt Lake City, for petitioners.

Jan Graham, Att'y Gen., Gale K. Francis, Asst. Att'y Gen., Salt Lake City, for respondents.

RUSSON, Justice:

¶ 1 Petitioners seek review of a final order of the Utah State Tax Commission denying petitioners' request that the Commission revoke three personalized license plates containing the word or letter combinations "REDSKIN," "REDSKNS," and "RDSKIN." We are asked to determine whether the Commission's order violated Utah Code Ann. § 41–1a–411 (1993) or Utah Administrative Code R873–22M–34 (1995). We reverse and remand for further proceedings.

## FACTS

¶ 2 Petitioners are Native American residents of Utah who object to the use of the term "redskin" on Utah license plates. They assert that this term is offensive and derogatory, and expresses contempt and ridicule toward their heritage, ethnicity, and race in violation of Utah Code Ann. § 41–1a–411 and Utah Administrative Code R873–22M–34. In December 1995, they petitioned the Motor Vehicle Division ("Division") of the Utah State Tax Commission ("Commission") to revoke the three license plates containing the term "redskin."[1] The Division denied their petition, and they appealed to the Commission.

¶ 3 The Commission, by and through the Division, is responsible for issuing personalized license plates pursuant to section 41–1a–411, which provides:

> The division may refuse to issue any combination of letters, numbers, or both that may carry connotations offensive to good taste and decency or that would be misleading.

Utah Code Ann. § 41–1a–411(2).

¶ 4 Exercising its rule-making authority,[2] the Commission created an administrative rule for denying certain personalized license plate requests. The rule states in pertinent part:

> B. Pursuant to Section 41–1a–411(2), the division may not issue personalized license plates in the following formats:

1. Combination of letters, words, or numbers with any connotation that is vulgar, derogatory, profane, or obscene.

. . . .

4. Combinations of letters, words, or numbers that express contempt, ridicule, or superiority of a race, religion, deity, ethnic heritage, gender, or political affiliation.

Utah Admin. Code R873–22M–34.

¶ 5 On August 28, 1996, the Commission held a formal hearing. Petitioner McBride and Robert Doren, both Native Americans, testified as to their personal experiences with the term "redskin," relating that the term is offensive and derogatory to them personally, to their families, and to all Native Americans. Other Native Americans submitted affidavits to the same effect, which were received as exhibits. The plate owners also testified at the hearing, asserting that they are fans of the Washington Redskins, a National Football League team in Washington, D.C., and that the only reason they requested the plates was to show their support and admiration for that team. They further testified that they harbored no ill-will toward Native Americans and had no intent to offend anyone or convey any negative message. One of the plate owners testified that three Native Americans with whom he worked were not offended by the use of the term "redskin" on his license plate and that "one actually wore a Washington Redskins ball cap and T-shirt." Also received into evidence were the results of a survey of 425 Native American tribal leaders indicating that 72.24% of them did not find the term "Washington Redskins" offensive.

¶ 6 On September 9, 1996, the Commission denied petitioners' request in a written order. The Commission determined that the same issues were raised by petitioners' attorney in *Brian M. Barnard v. Motor Vehicle Division*, Appeal 94–1547, and that the final order in that appeal, dated December 22, 1994, was fully dispositive of petitioners' ap-

---

1. Only two of these plates are currently in existence. The third plate, "RDSKIN," expired several years ago and was not renewed.

2. *See* Utah Code Ann. § 41–1a–104(3) (granting Commission authority to "make and enforce rules necessary to effectuate [the Motor Vehicle Act]").

peal.[3] The Commission attached a copy of its 1994 order and incorporated it into the 1996 order, which is the subject of this appeal.[4]

¶ 7 In denying petitioners' request, the Commission stated in its written order, "In light of the fact that the term 'Redskin' is used pervasively throughout our society in reference to sports teams, it is the opinion of Commissioners Oveson and Shearer that the term 'Redskin' is not 'offensive' and does not express 'contempt, ridicule, or superiority.'" The two commissioners who constituted the majority also stated that, in their opinion, the license plates expressed positive support and were therefore well within the limits of the statute and the Commission's rule.

¶ 8 Commissioner Tew wrote a concurring opinion stating that while he personally may agree that the term "redskin" is offensive, "the Commission must evaluate whether the general public, as opposed to individuals or individual groups, would consider a plate request 'offensive to good taste and decency' or 'vulgar, derogatory, profane, or obscene' or portraying 'contempt, ridicule, or superiority.'" Because he concluded that the general public "to date" had not found the term offensive or expressive of contempt, ridicule, or superiority, he agreed with the majority that petitioners' request should be denied.

¶ 9 Commissioner Pacheco wrote a dissenting opinion in which he stated, "At what point and to what point of degradation the term [redskin] becomes offensive to society I do not know, but I do know the term is offensive to some people and that should be sufficient enough grounds to revoke these license plates."

¶ 10 Before this court, petitioners contend that the Commission's decision should be overturned on the following grounds: (1) that the Commission violated section 41–1a–411 of the Utah Code; (2) that the Commission violated administrative rule 873–22M–34;

and (3) that the Commission's decision was not supported by substantial evidence.

## STANDARD OF REVIEW

¶ 11 The standard of review in this case is governed by Utah Code Ann. § 59–1–610, which states in part:

(1) When reviewing formal adjudicative proceedings commenced before the commission, the Court of Appeals or Supreme Court shall:

(a) grant the commission deference concerning its written findings of fact, applying a substantial evidence standard on review; and

(b) grant the commission no deference concerning its conclusions of law, applying a correction of error standard, unless there is an explicit grant of discretion contained in a statute at issue before the appellate court.

Utah Code Ann. § 59–1–610(1) (1996).

¶ 12 The legislature granted the Commission discretion in determining whether to grant or refuse an applicant's request for personalized license plates. *See* Utah Code Ann. § 41–1a–411 ("The division *may refuse* to issue any combination of letters, numbers, or both that may carry connotations offensive to good taste and decency or that would be misleading." (emphasis added)). When the legislature grants discretion to the Commission, we review the Commission's actions under a reasonableness standard. *See Eaton Kenway v. Auditing Div.*, 906 P.2d 882, 884 (Utah 1995). An agency which has been granted discretion by statute may limit its own discretion in its regulations. *See Ashcroft v. Industrial Comm'n*, 855 P.2d 267, 269 (Utah Ct.App.1993). By adopting rule 873–22M–34 the Commission limited the discretion given to it by the legislature. *See* Utah Admin. Code R873–22M–34 (stating that "the division *may not* issue

---

3. After the Commission denied this first challenge to the plates, Mr. Barnard sought review by this court. *See* Utah Code Ann. § 78–2–2(3)(e)(ii). Pursuant to Utah Code Ann. § 78–2–2(4), we transferred the case to the Utah Court of Appeals. That court denied review on the ground that Mr. Barnard lacked standing to challenge the ruling. *See Barnard v. Motor Vehicle Div.*, 905 P.2d 317, 320–23 (Utah Ct.App.1995).

4. Because only the 1994 order contained any analysis, when we cite to the Commission's order in the present appeal, we are referring to the language contained in the 1994 order.

personalized license plates ... with any connotation that is vulgar, derogatory, profane, or obscene." (emphasis added)). When reviewing an agency's application of its own rules, we will not disturb its interpretation or application of its rules "unless its determination exceeds the bounds of reasonableness and rationality." *Brown & Root Indus. Serv. v. Industrial Comm'n*, 947 P.2d 671, 677 (Utah 1997) (citations omitted).

## ANALYSIS

¶ 13 As is evident from the Commission's order, the Commissioners could not agree on the appropriate test to apply in determining whether the license plates should be revoked. Commissioners Oveson and Shearer believed that their own opinions of offensiveness were controlling. Commissioner Tew, however, believed that the appropriate test was whether the "general public" would consider the plates offensive. In his dissent, Commissioner Pacheco argued that the test should be whether only "some people" are offended.

¶ 14 Unfortunately, neither section 41–1a–411 nor rule 873–22M–34 provides any guidance as to the appropriate test. Section 41–1a–411(2) states, "The division may refuse to issue [a license plate] that may carry connotations offensive to good taste and decency." Similarly, rule 873–22M–34 states that "the division may not issue personalized license plates ... with any connotation that is vulgar, derogatory, profane, or obscene [or] that express[es] contempt, ridicule, or superiority of a race, religion, deity, ethnic heritage, gender or political affiliation." Neither the statutory section nor the administrative rule indicates from whose perspective the Commission should look to determine whether a particular license plate contains a prohibited connotation or expression.

¶ 15 Relying upon the opinion of any one person or group in determining whether a term carries a prohibited connotation is not a reasonable application of either section 41–1a–411 or rule 873–22M–34. This would be so whether the opinion is that of a government official, a Native American, a non-Native American, or the general public. For example, the personal opinions of individual commissioners should not be relevant in ap-

plying the rule, for a term that is offensive or derogatory to one commissioner may be innocuous to another. Permitting the Commission to base its decisions upon the personal opinions of its commissioners would be tantamount to allowing an agency to follow or ignore its own rules to suit its own purposes—an approach which lies at the very heart of arbitrary and capricious action and which would frustrate the Commission's proper role to apply its rules consistently and objectively, regardless of the personal views of individual commissioners.

¶ 16 Likewise, it would not be reasonable for the Commission to rely upon the general public's perception of a certain term because the general public may be wholly ignorant of a term's connotation. For example, offensive slang in an obscure foreign language may be meaningless to the general English-speaking public; nevertheless, the reasonable person who speaks the foreign language would conclude that the slang carries an offensive connotation. *See, e.g., Kahn v. Department of Motor Vehicles*, 16 Cal.App.4th 159, 20 Cal. Rptr.2d 6, 13 (1993) (revoking license plate containing court reporter symbols representing "the four letter epithet often referred to as the 'F-word' ").

¶ 17 Finally, the Commission could not reasonably rely upon the opinion of any one group, whether it be small or large. Such an approach could preclude the issuance of any personalized license plate because the members of any group could assert that any given term is offensive to them. To illustrate, the Commission gave an example in its order of a complainant who challenged the issuance of a license plate bearing the combination, "O23 GNG." According to the complainant, the plate extolled the virtues of the 23rd Street Gang in Ogden, Utah. Ironically, the plate was not a personalized plate, but a normal plate bearing letters and numbers generated by computer. Nevertheless, the preceding example shows that virtually any term could be barred so long as "some people" found it offensive.

¶ 18 The only reasonable standard that may be applied is that of the objective, reasonable person. In other words, under

rule 873–22M–34 the Commission had to determine, in light of all the evidence presented, whether an objective, reasonable person would conclude that the term "redskin" contains any vulgar, derogatory, profane, or obscene connotation, or expresses contempt, ridicule, or superiority of race or ethnic heritage. *See Kahn,* 20 Cal.Rptr.2d at 13 ("The test is what people of ordinary intelligence (who know the language in question) would understand from the use of the word.").[5] If such a person would conclude that the term carries a prohibited connotation, rule 873–22M–34 prohibits the Commission from issuing a license plate carrying that term.

¶ 19 The Commission in its written order determined that the term "redskin" was not offensive either to individual commissioners or to the general public and that the term therefore did not violate either section 41–1a–411 or rule 873–22M–34. In light of the foregoing, we hold that the Commission did not apply the correct test in determining whether a license plate contains a prohibited connotation or expression. We therefore reverse the Commission's order and remand for further proceedings consistent with this opinion.

■ ¶ 20 We emphasize that we remand this case to give the Commission the opportunity to apply the correct standard to the facts in this case. While we could easily make a final disposition of many issues that come before us, we must exercise judicial restraint to maintain the integrity of our judicial system. For instance, if a trial court applies an incorrect standard in sentencing a convicted criminal, we do not sentence the criminal on appeal using the correct standard. Rather, we remand the case with instructions to the trial court to apply the correct standard. We do so because the duty of sentencing convicted criminals is within the province of the trial court, not this court.

¶ 21 Likewise, the Commission, not this court, has been authorized to issue and revoke personalized license plates according to the rules and regulations that it promulgates. We thus remand the case so that the Commission may fulfill its duty. While Justice Durham would step into the role of a Utah State Tax Commissioner in order to weigh the evidence and decide the issue in the first instance, *see* ¶ 33 ("I would hold that the objections and evidence offered by those offended should prevail."), we refuse to do so. By exercising judicial restraint, we maintain the integrity of our system, which admonishes one branch or department of the government to refrain from intruding upon the duties and functions of another.

¶ 22 It is so ordered.

¶ 23 Chief Justice HOWE concurs in Justice RUSSON's opinion.

ZIMMERMAN, Justice, concurring specially:

¶ 24 I join generally in the majority's reasoning and agree with its decision to remand the matter to allow the Utah State Tax Commission the opportunity to apply the correct standard to the facts of this case.

¶ 25 I note that the Tax Commission's own rule requires it to deny a personalized plate that has a term that a reasonable person would conclude has "*any* connotation that is ... derogatory." Without prejudging the matter, it appears that it would be extremely difficult for a "reasonable person" to find that the term "redskin" does not have at least one offensive connotation.

5. In *Kahn,* a California appeals court affirmed the Department of Motor Vehicle's revocation of a license plate bearing the letters, "TP U BG." The plate owner, who was a court reporter, stated that the letters were court-reporting symbols for the phrase, "if you can"—a phrase from the children's story, "The Little Engine That Could." However, another court reporter who saw the license plate complained, asserting that in stenographic shorthand, the letters TP could be translated as "F" and the letters BG could be translated as "CK" or "K." Thus, the reporter demonstrated that the plate could read: "F" "U" "CK" or "K." *See Kahn,* 20 Cal.Rptr.2d at 8. The court concluded that court reporters and people who understand court reporting shorthand would ordinarily translate the letters as the "F" word and therefore upheld the Division's revocation of that plate. *See id.* at 13.

DURHAM, Associate Chief Justice, dissenting:

¶ 26 The end of the majority opinion's extensive analysis is a refusal to invalidate the issuance of personalized license plates containing an acknowledged racial epithet. This court should hold that the Tax Commission violated its own administrative rule, and we should also invalidate the issuance of the plates outright instead of remanding the matter to the Tax Commission. For these reasons, I dissent.

¶ 27 The majority addresses whether the Commission's action violated its own administrative rule and correctly finds that it did. In declaring that the Tax Commission violated its own administrative rule, the majority applies an objective "reasonable person" standard to which the Commission must adhere when determining whether a term carries "any" connotation that is derogatory, vulgar, profane, or obscene. Rule 873–22M–34 mandates:

> B. Pursuant to Section 41–1a–411(2), the division may not issue personalized license plates in the following formats:
>
> 1. Combination of letters, words, or numbers with any connotation that is vulgar, derogatory, profane, or obscene.
>
> . . . .
>
> 4. Combinations of letters, words, or numbers that express contempt, ridicule, or superiority of a race, religion, deity, ethnic heritage, gender, or political affiliation.

Utah Admin. Code R873–22M–34 (1995).

¶ 28 The rule clearly states that "any connotation" that is derogatory, obscene, profane, or vulgar is strictly prohibited. *Id.* Nevertheless, the majority gratuitously, and with no analytical support, declares that "[r]elying upon *the opinion* of any one person or group in determining whether a term carries a prohibited connotation is not a reasonable application of either section 41–1a–411 or rule 873–22M–34." ¶ 15 (emphasis added). While the majority correctly holds that the "personal opinion" of the Tax Commissioners is not the appropriate standard of review, it also asserts that the "opinion" of the petitioners should not count either. ¶ 15.

Unfortunately, the majority chooses to ignore the fact that while the Tax Commissioners apparently did rely upon their personal opinions in deciding this issue, the petitioners introduced far more than mere opinion as to the term's offensiveness into evidence. The majority ignores (a) the dictionary definitions of the term; (b) the historical roots of the term as explained by texts and articles; (c) the actions taken by universities and city councils nationwide; and (d) the expert testimony of educators and clinical psychiatrists. The majority dismisses *all* of this evidence as nothing more than "opinion."

¶ 29 I do not understand exactly what evidence the majority would require to demonstrate that a derogatory and obscene racial slur is more than just the "opinion" of its targets and is in fact offensive. Certainly, in my mind, petitioners proved far more than just their personal opinion. The facts, ignored by the majority, are that in 1755, the British Crown offered a bounty for the scalps of Native American men, women, and children living in the New England colonies. *See* George Russell, *American Indian Digest: Contemporary Demography of the American Indian* 12–13 (1995 ed.). As stated plainly in the affidavit of a clinical psychologist:

> To demonstrate that there had been a kill, soldiers were required to skin the body of the Native American and bring in the "red skin." "Redskin" is in particular a horrifying reminder of what amounted to genocide of many of the Native American people. They are acutely aware of its meaning.

Thus, the Washington Redskins football team (and the would-be owners of the personalized Utah license plates at issue here) utilize the name and symbol of the genocidal practice of paying white soldiers a bounty for the bloody skins of murdered Native Americans.

¶ 30 Furthermore, petitioners have cited numerous studies, affidavits, articles, and personal testimony of Native Americans who are deeply offended by the use of the term.

¶ 31 In addition, the majority fails to consider the current trend, clearly documented by petitioners, away from the cartoonish and derogatory use of the image of Native Ameri-

cans as mascots. Saint John's University has in recent years changed the name of its mascot from "Redmen" to "Red Storm." Sioux City, Iowa, has recently ceased using the name "Soos" for its minor league baseball team. The Washington Redskins have been under fire for years to change the name of its football team. On March 5, 1992, the *Washington Post* editorialized against the continued use of the name "Redskins" for the Washington, D.C., football team: "That the usage is common and innocently repeated out of habit makes it no less of an insensitive or insulting remark to those who are on the receiving end. We can do better." *The Redskin Issue*, Wash. Post, March 5, 1992, at A20. Moreover, the District of Columbia City Council has passed a resolution asking the Washington Redskins to change its team name to "a name that is not offensive to Native Americans or any other minority group." Because the team is privately owned, of course, it can take any name it wishes and ignore editorials and public opinion generally. However, it strikes me as disrespectful and presumptuous for this court to discount every piece of testimony and evidence from Native American citizens. The Tax Commission ought not to have done so, and the majority errs in following suit.

¶ 32 Finally and conclusively, the majority fails to address the telling, and in my mind determinative, argument that the definition of "redskin" in the dictionary mirrors almost exactly the dictionary definition of the counterpart term for another racial minority—the "n" word. "The term 'Redskin' has been defined by Webster's Ninth New Collegiate Dictionary as 'American Indian—usually taken to be offensive.'" Kimberly A. Pace, *The Washington Redskins Case and the Doctrine of Disparagement: How Politically Correct Must a Trademark Be?*, 22 Pepp. L.Rev. 7, 51 (1994) (quoting *Webster's Ninth New Collegiate Dictionary* 987 (9th ed.1990)). Similarly, "the term [the 'n' word] is defined by this same dictionary as 'Negro—usually taken to be offensive.'" *Id.* at n. 278. No court in this country would approve legislative enactment allowing the use of such a destructive epithet as the "n" word on a license plate. Notwithstanding this equivalence in the dictionary—an objective source indeed—

the majority remands this case to the Tax Commission for further consideration. I would reverse the Tax Commission and immediately revoke the personalized plates at issue.

¶ 33 Based on the foregoing objections, I do not approve of the objective reasonable person standard enunciated in the majority opinion. Rather, I would hold that the objections and evidence offered by those offended should prevail. I certainly agree that the personal opinions of the Tax Commissioners are of no import, particularly after their ruling, as reported in the *Salt Lake Tribune*, holding that the terms "TAXLAND," "TAX2MAX," and "MINWAGE" were too offensive and derogatory to allow display on personalized license plates. *See License Plates 2MAKETAX Folks See Red*, Salt Lake Tribune, June 3, 1998, at B1. However, I do not agree that the opinions and compelling evidence put forward by the Native American petitioners do not provide sufficient basis to reverse the Tax Commission.

¶ 34 Petitioners introduced overwhelming evidence showing that the term "redskin" is derogatory and profane, that it expresses contempt and ridicule, and that it references the historical domination of a defined class of persons based on race and ethnic heritage. This evidence demonstrates conclusively that the Tax Commission violated its own rule. By ignoring evidence and by establishing an arbitrary reasonable person standard, the majority misses the mark imposed by rule 873–22M–34.

¶ 35 It is to be hoped that one day all offensive and derogatory language, speech, and symbols predicated on race will be completely eradicated from our culture. In the meantime, public officials have the obligation to ensure that they are not used with the imprimatur of the State.

¶ 36 Justice STEWART concurs in Associate Chief Justice DURHAM's dissenting opinion.